# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

PATSY ANN AMARO, et al.,

    Plaintiffs,

    v.

JOHN CARTER, et al.,

    Defendants.

2:22-CV-23

## ORDER

This case arises out of the events surrounding the death of Mr. Johnny Conley during his ten days as a pretrial detainee at the Wayne County jail in Jesup, Georgia.  Dkt. No. 38 ¶¶ 1-3. Before the Court is a partial motion to dismiss filed by Defendants John Carter, Tyra Little, James Stevens, Cheryl Harris, Jonathan McCallum, Garyon Johnson, Mary Ann Blash, and Noah Saedroa.  Dkt. No. 41.  After reviewing the briefs and holding a hearing, the Court **DENIES** the motion.

BACKGROUND[1]

On August 5, 2020, Mr. Conley was arrested and booked into the Wayne County Jail (the "Jail").  Dkt. No. 38 ¶ 1.  Since his teenage years, and at the time of his arrest, "Mr. Conley suffered from an epilepsy disorder for which he was treated by a physician" and prescribed medications to control seizures.  Id.

The Wayne County Sheriff contracts with a third-party medical provider, Defendant Southeast Correctional Medical Group, LLC ("SCMG") for inmate medical services.  Id. ¶ 22.  When Mr. Conley was admitted to the Jail, Defendant Shala Wingate, an SCMG nurse, completed a "Receiving Screening" form.  Id.  ¶¶ 64-66.  On that form, Defendant Wingate noted that Mr. Conley suffered from "Epilepsy" and a "Seizure Disorder," and he was prescribed three medications by his treating physician to control his seizures, including "clonazepam" (commonly known as "Klonopin").  Id. ¶ 66; Id. at 61-62.  Despite learning from Mr. Conley's pharmacy that his prescribed dose of Klonopin was twice daily, Defendant Wingate wrote on Mr. Conley's intake form that the medicine had been

---

[1] For purposes of ruling on Defendants' motion to dismiss, the Court takes Plaintiffs' version of the facts as true.  Am. United Life Ins. Co. v. Martinez, 480 F.3d 1043, 1057 (11th Cir. 2007) ("[W]hen ruling on a motion to dismiss, a court must view the complaint in the light most favorable to the plaintiff and accept all of the plaintiff's well-pleaded facts as true." (citing St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am., 795 F.2d 948, 954 (11th Cir. 1986))).

prescribed only on an "as needed" basis, and she discontinued Mr. Conley's Klonopin prescription.  Id. ¶¶ 66-67; Id. at 61-62.

Mr. Conley had his first of many seizures while detained "[s]hortly after arriving at the Wayne County Jail."  Id. ¶ 2; see also id. ¶¶ 35, 40-42, 48, 68, 71-72, 92.  During the ten days Mr. Conley was confined at the Jail, "his brother Cory Conley told the on-duty jail personnel – including each of the Defendants – that Mr. Conley's seizures were not controlled, were getting worse, and required medical intervention. Cory Conley's pleas for treatment of his brother were completely ignored."  Id. ¶ 31.

On August 9, 2020, four days after Mr. Conley arrived, he fell after experiencing a seizure and was hospitalized.  Id. ¶¶ 35, 72.[2]  As a result of the fall, Mr. Conley "lacerated and fractured his skull" and "received a dozen sutures."  Id.  ¶¶ 35, 72. According to the amended complaint, the Jail's medical records show that the hospital "insisted that [Mr. Conley] be monitored closely and returned for emergency care if his seizure disorder worsened."  Id. ¶ 35.  On August 10, 2020, Defendant Wingate was informed of Mr. Conley's hospitalization and went to Mr. Conley's cell "to check on him," and she "documented that he was alert and

---

[2] Plaintiffs' amended complaint, id. ¶ 72, and the attached affidavit of Lori Roscoe, Ph.D., ANP-C, CCHP-RN, id. at 62, both note that Mr. Conley was hospitalized on August 9, 2020, however, the attached affidavit of Todd Wilcox, M.D., notes that Mr. Conley was hospitalized on August 10, 2020, id. at 48.

oriented and that the wound was intact and clean." Id. at 62. At that time, Defendant Wingate did not assess Mr. Conley's vitals, nor did she perform any other evaluation. Id.

According to the affidavit of Lori Roscoe, Defendant Wingate saw Mr. Conley on August 7, August 10, August 12, twice on August 13, and twice on August 14. Id. at 62-65. All but two[3] of these instances were allegedly in response to Mr. Conley himself or various members of the Jail staff notifying Defendant Wingate that Mr. Conley had a seizure, had some sort of injury resulting from a seizure, or was refusing to take his medication. Id.

Defendant Wingate either witnessed Mr. Conley seize or received reports of his seizures or resulting injuries from various members of the jail staff. Id. ¶¶ 71-74. The amended complaint alleges that despite her knowledge of Mr. Conley's seizures, "[Defendant Wingate] did nothing" and "instead chose to believe— without any evidence—that Mr. Conley was faking his physician-diagnosed epileptic disorder for attention." Id. ¶¶ 70-71, 73-74.

---

[3] Defendant Wingate saw Mr. Conley on two instances which, based on the amended complaint, do not appear to be at the request of Mr. Conley or any of the jail staff. First, Defendant Wingate saw Mr. Conley on August 13, 2020, at an unspecified time, at his cell door, and Mr. Conley requested water. Id. at 63. Second, Defendant Wingate saw Mr. Conley on August 14, 2020, as she "looked at Mr. Conley through the cell window and he was sitting up against the wall and had no evidence of distress at that time." Id. at 65.

*i.*   *August 12, 2020: Defendants Stevens, Wingate, and Pope*

On August 12, 2020, just two days before Mr. Conley's death, Defendant Stevens, a detention officer at the Jail, saw Mr. Conley in his jail cell "seizing . . ., incoherent, his shirt covered in blood, his head bleeding, and his pants soiled." Id. ¶¶ 40, 92. Mr. Conley was "removed from his cell for it to be cleaned and for him to be put in a new set of clothes." Id. ¶ 40.

Defendant Wingate was then called to Mr. Conley's cell "because he stated he had a seizure, and his head was bleeding." Id. at 63. Defendant Wingate "noted a small amount of bright red blood on an area of the staples, and she cleaned it with hydrogen peroxide" but did not evaluate Mr. Conley any further despite Mr. Conley reporting "that he did not know what happened." Id. At this time, Defendant Wingate noted in Mr. Conley's health records that his vitals "were within normal limits (WNL)," and that he was "alert and oriented and his eyes were equal and reactive," even though, according to the amended complaint, video of the area during that time does not show that Defendant Wingate was equipped with the proper tools to measure vital signs. Id.

On that same day, Mr. Conley was also evaluated by Defendant Dr. Myra Pope. Id. at 48. Defendant Pope's notes indicate that Mr. Conley had a seizure that morning and bit his tongue. Id. at 49. Defendant Pope also recorded that Mr. Conley's pupils were

dilated and noted the following in his health record: "? detoxing from something ? meth" and "trying to manipulate."  Id.

According to the amended complaint, "[n]either Defendant Stevens nor any of the John Doe Defendants[4] did anything else to actually address Mr. Conley's seizures and his other serious medical needs."  Id. ¶ 40.

*ii.   August 13, 2020: Defendants Harris and Wingate*

On August 13, 2020, Mr. Conley had another seizure, and "[j]ail personnel, including Defendant Harris, a detention officer at the Jail, and certain of the John Doe Defendants, watched the seizure and did nothing to help Mr. Conley."  Id. ¶ 41.  At an unspecified time, Defendant Wingate saw Mr. Conley at his cell door, and he requested water, which, according to Defendant Wingate's notes, "the officers would bring."  Id. at 63.  Then, at approximately 6:00 p.m., Defendant Harris called Defendant Wingate and told her that Mr. Conley was "acting as if he was having a seizure and spitting out his medication, but also talking."  Id. at 63-64.  Defendant Wingate told Defendant Harris "to make sure Mr. Conley took his medications, and to call her back if needed."  Id. at 64. According to the amended complaint, Defendant Wingate did not receive further communication regarding Mr. Conley that

---

[4] The amended complaint alleges that "Defendant John Does #1 - #5 are additional employees of the Wayne County Jail, identities currently unknown, who were on duty during Mr. Conley's confinement at that facility."  Id. ¶ 25.

night but noted in Mr. Conley's Medication Administration Record that these medications were administered.  Id.

   iii. *August 14, 2020: Defendants Wingate, Stevens, Harris,*
        *Blash, Saedroa, Little and Johnson*

Early in the morning on August 14, 2020, Mr. Conley "was dragged out of his cell on his mattress by Defendant Harris and certain of the John Doe Defendants."  Id. ¶ 42.  Mr. Conley was "barely moving, was unresponsive, and had bruises all over his body caused from numerous falls and uncontrolled movements in his cell."  Id.  At that time, Plaintiffs allege Mr. Conley "told jail personnel he did not feel good" but "[n]o one did anything to help him."  Id.

On that same day, Defendant Little, a detention officer at the Jail, observed that Mr. Conley was not getting up from the floor of his cell, and he was "making noises, kicking the wall, and flopping around on the mat on the floor of his cell."  Id. ¶ 43.  Defendant Johnson, a detention officer at the Jail, also observed Mr. Conley "rolling around from side to side and making a whining noise."  Id. ¶ 45.

Defendant Blash, who "was in charge of performing cell checks on August 14" and who knew Mr. Conley was having seizures, later told investigators that "she did not need to check on [Mr.] Conley often because she could hear him moaning."  Id. ¶ 44.  Defendant Blash also told investigators that "she believed that Mr. Conley

7

was 'pleasuring himself' as he rolled around, bruised, shirtless, pantsless [sic], incoherent, and moaning, on the bare floor of his cell." Id.  Plaintiffs allege that despite these observations, Defendants Little, Blash, and Johnson "did nothing to help Mr. Conley." Id. ¶¶ 42-45.

Later, on August 14, "and into the early morning of August 15," Defendant Stevens observed that Mr. Conley "was incoherent, acting funny, had mucus and a weird blue color in his eyes, and seemed as if perhaps he had a seizure." Id. ¶ 46.  In that same time frame, Defendant Saedroa, a detention officer at the Jail, "observed Mr. Conley hitting doors with his legs, rolling around, and moaning." Id. ¶ 47.  Defendant Stevens and Saedroa similarly "did nothing to help Mr. Conley." Id. ¶¶ 46-47.  According to the amended complaint,

> For most of the last 24 hours of his life, throughout August 14 and into the morning hours of August 15, Mr. Conley lay seizing, moaning, and writhing on the floor of his cell. He ate and drank nothing that entire day. Jail personnel just kept stacking more and more food containers and cups of juice in his cell – none of which Mr. Conley touched.

Id. ¶ 48.

Also on August 14, Defendant Wingate was called to Mr. Conley's cell twice—once at approximately 12:30 p.m. and once at approximately 4:35 p.m. Id. at 64-65.

Defendant Wingate made her first of these visits "because [Mr. Conley] was laying on the floor refusing to take his

medication." Id. at 64. So, Defendant Wingate "repositioned him to sit up," and "Mr. Conley informed [Defendant Wingate] that he felt as if he may have a seizure." Id. Defendant Wingate then administered Mr. Conley his medication and documented that his "vital signs [] were 'WNL' (within normal limits)." Id. However, Defendant Wingate wrote that Mr. Conley's "respirations were noted to be 24 breaths per minute which is tachypnea," but according to the amended complaint, video indicates that she did not have equipment to measure vitals. Id. Defendant Wingate also did not conduct a physical examination at the time. Id. Additionally, Defendant Wingate later told GBI agents that Mr. Conley "was talking, shifting, laying down and sitting up, and indicated that he did not feel good; and she believed Mr. Conley was under the influence of illicit substances." Id. However, Defendant Wingate did not record these observations and opinions in Mr. Conley's health records, and she did not evaluate Mr. Conley, "nor did she offer any assistance to Mr. Conley at that time." Id. at 64-65.

During her second visit with Mr. Conley on August 14 at approximately 4:35 p.m., Defendant Wingate "looked at Mr. Conley through the cell window." Id. at 65. Defendant Wingate "documented" that Mr. Conley was "sitting up against the wall and had no evidence of distress at that time." Id. However, according to the GBI investigatory report, Defendant Wingate "noted that he was shifting his legs and acting funny, and she informed jail staff

9

that they could send Mr. Conley out to the hospital if they needed to." Id. But Defendant Wingate did not include this in Mr. Conley's health records. Id.

   *iv. August 15, 2020: Defendants Little, McCallum, and Johnson*

     In the early morning on August 15, 2020, Defendant Little found Mr. Conley unresponsive in his cell. Id. ¶ 49. At the time, Mr. Conley "was curled up on the concrete floor near the door" and "had dried blood under his nose," id., and despite the stack of food containers and juice cups in his cell, he had not eaten or drunk anything all day, id. ¶ 48. Defendants Little and Johnson, accompanied by Defendant McCallum, who was also a detention officer at the Jail, then "dragged Mr. Conley into a wheelchair and propped him up in the jail's hallway." Id. ¶ 49. After Mr. Conley was in the wheelchair, Defendant McCallum placed shackles on Mr. Conley's legs. Id. While Mr. Conley's wheelchair was parked in the Jail hallway, "Mr. Conley's head lolled back, he stopped breathing, and his eyes became blank and fixed." Id. ¶ 50. At some point during this period, Defendant Little placed a blood pressure cuff on Mr. Conley and determined that Mr. Conley did not have a pulse. Id. ¶ 54. Plaintiffs allege that despite the "patently obvious" risk of harm proposed by Mr. Conley's seizure condition "and/or symptoms of withdrawal," id. ¶ 55, "Defendants Little, McCallum, and Johnson each had knowledge of Mr. Conley's serious medical conditions that morning, had ample opportunity to respond, but failed entirely to

take any first-aid or life-saving actions," id. ¶ 52.  Apparently, at some point within one half-hour after finding Mr. Conley unresponsive, someone at the Jail called an ambulance.  Id. ¶¶ 4, 53.

After the ambulance finally arrived, the paramedics noted that Mr. Conley "had no pulse, was not breathing, had dilated pupils, and was cold, grey, and dry." Id. ¶ 5.  The paramedics also noted "abrasions all over Mr. Conley's body, which they thought looked like someone had 'beat the crap out of him.'" Id. One paramedic explained that he "had responded to many seizure incidents but had never seen seizures result in so many bruises as Mr. Conley had all over his body." Id. Despite resuscitative measures performed both by the paramedics and later at the hospital, Mr. Conley was pronounced dead later that morning. Id. ¶ 6.  "The coroner found that the cause of Mr. Conley's death was his seizure disorder." Id. ¶ 7.

## Procedural Background

After Mr. Conley's death, his mother, father, and the co-administrators of his estate brought this action alleging multiple claims.  Dkt. No. 1.  Counts One through Five allege constitutional claims under 42 U.S.C. § 1983 against:

- Sergeant Tyra Little (Count I),

- Corporal James Stevens (Count I),

- Sergeant Cheryl Harris (Count I),

- Officer Jonathan McCallum (Count I),

- Sergeant Garyon Johnson (Count I),

- Corporal Mary Ann Blash (Count I),

- Officer Noah Saedroa (Count I)

- Nurse Shala Wingate (Count II)

- Dr. Myra Pope (Counts III, V)

- Wayne County Sheriff John Carter (Count IV)

- SCMG (Count V)

Dkt. No. 1 ¶¶ 29-146.

Counts Six and Seven allege medical professional negligence claims against Defendants Pope, Wingate, and SCMG. Id. ¶¶ 147-63. Count Eight alleges negligent hiring, retention, and supervision claims against Defendant SCMG. Id. ¶¶ 164-70. Counts Nine and Ten seek attorneys' fees from all Defendants pursuant to 42 U.S.C. § 1983 and O.C.G.A. § 13-6-11, respectively. Id. ¶¶ 171-173.

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants Carter, Little, Stevens, Harris, McCallum, Johnson, Blash, and Saedroa moved to partially dismiss Plaintiffs' claims against them. Dkt. No. 22. Plaintiffs then moved for leave to amend, dkt. no. 35, which was granted, dkt. no. 37, and subsequently filed the amended complaint, dkt. no. 38. The amended complaint differs from the original complaint only by the addition

of six paragraphs.  See Dkt. No. 38 ¶¶ 36– 39, 51, 52.  Defendants then filed the present joint partial motion to dismiss.  Dkt. No. 41.

## LEGAL AUTHORITY

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  While this pleading standard does not require "detailed factual allegations," "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  In order to withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Id. (quoting Twombly, 550 U.S. at 570).  A complaint is plausible on its face when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.

In deciding whether a complaint states a claim for relief, the Court must accept the facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff. Ray v. Spirit Airlines, Inc., 836 F.3d 1340, 1347 (11th Cir. 2016). The Court should not accept allegations as true if they merely

recite the elements of the claim and declare that they are met; legal conclusions are not entitled to a presumption of truth. Iqbal, 556 U.S. at 678-79.

A complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." Fin. Sec. Assurance, Inc. v. Stephens, Inc., 500 F.3d 1276, 1282-83 (11th Cir. 2007) (per curiam) (quoting Roe v. Aware Woman Ctr. for Choice, Inc., 253 F.3d 678, 683 (11th Cir. 2001)). Ultimately, if "the well-pleaded facts do not permit the court to infer more than the mere *possibility* of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (alteration in original) (emphasis added) (quoting Fed. R. Civ. Proc. 8(a)(2)).

It is important to note that while the factual allegations set forth in the complaint are to be considered true at the motion to dismiss stage, the same does not apply to legal conclusions set forth in the complaint. Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1260 (11th Cir. 2009) (citing Iqbal, 556 U.S. at 678). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555). The court need not "accept as true a legal conclusion couched as a factual

allegation." <u>Twombly</u>, 550 U.S. at 555 (quoting <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986)).

Lastly, exhibits attached to pleadings become part of a pleading.  Fed. R. Civ. P. 10(c).  Consequently, a court may consider documents attached to a complaint as exhibits in resolving a motion to dismiss without converting the motion to one for summary judgment.  <u>Taylor v. Appleton</u>, 30 F.3d 1365, 1368 n.3 (11th Cir. 1994).

**DISCUSSION**

**I.   Plaintiffs' deliberate indifference claims against Defendants Stevens, Harris, Blash, Saedroa, Little, Johnson, and McCallum (collectively, the "Officer Defendants")**

The Officer Defendants contend they are entitled to qualified immunity from suit for Plaintiffs' deliberate indifference claims. Qualified immunity protects "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Corbitt v. Vickers</u>, 929 F.3d 1304, 1311 (11th Cir. 2019) (alteration in original) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)). Neither party disputes that Defendants performed discretionary functions in this case.  "Once

discretionary authority is established, the burden then shifts to the plaintiff to show that qualified immunity should not apply." Lewis v. City of W. Palm Beach, 561 F.3d 1288, 1291 (11th Cir. 2009) (citing Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002).

The Supreme Court has recognized a two-step process for analyzing whether qualified immunity adheres. Id. (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)). To determine whether qualified immunity protects a defendant, a court examines whether (1) "the officer's conduct amounted to a constitutional violation" and (2) "the right violated was 'clearly established' at the time of the violation." Id. (citing Saucier, 533 U.S. at 201). A court may examine either prong first; "it is . . . not mandated that the Court examine the potential constitutional violation under Saucier step one prior to analyzing whether the right was clearly established under step two." Id. (citing Pearson v. Callahan, 555 U.S. 223, 236 (2009)).

Plaintiffs' claims against the Officer Defendants are for deliberate indifference of a serious medical need. Dkt. No. 38 ¶¶ 29-64. So, Plaintiffs must allege: "(1) the prisoner had a serious medical need; (2) the defendant acted with deliberate indifference to the prisoner's serious medical need; and (3) the defendant's wrongful conduct caused the prisoner's injury." Davison v. Nicolou, No. CV-616-039, 2016 WL 6404034, at *3 (S.D.

16

Ga. Oct. 27, 2016) (citing <u>Goebert v. Lee Cnty.</u>, 510 F.3d 1312, 1326 (11th Cir. 2007)).[5]

## A. Mr. Conley's Serious Medical Need

The Officer Defendants do not dispute that Mr. Conley's "uncontrolled epileptic condition," qualifies as an objectively serious medical need. Dkt. No. 41 at 12-16. A serious medical need "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." <u>Goebert</u>, 510 F.3d at 1326 (quoting <u>Hill</u>, 40 F.3d at 1187). "[T]he medical need must be one that, if left unattended, poses a substantial risk of serious harm." <u>Taylor v. Hughes</u>, 920 F.3d 729, 733 (11th Cir. 2019) (alteration in original) (quoting <u>Farrow v. West</u>, 320 F.3d 1235, 1243 (11th Cir. 2003)). Mr. Conley's epileptic condition was both diagnosed by a physician and treated through his prescription for Klonopin. Dkt. No. 38 at 61-62.

---

[5] "Claims of deliberate indifference to the serious medical needs of pretrial detainees are governed by the Fourteenth Amendment's Due Process Clause, rather than by the Eighth Amendment's Cruel and Unusual Punishment Clause" (which applies to duly sentenced prisoners). <u>Andujar v. Rodriguez</u>, 486 F.3d 1199, 1203 n.3 (11th Cir. 2007) (citing <u>Lancaster v. Monroe Cnty.</u>, 116 F.3d 1419, 1425 n.6 (11th Cir. 1997)); <u>Hill v. DeKalb Reg'l Youth Det. Ctr.</u>, 40 F.3d 1176, 1185 n.19 (11th Cir. 1994), <u>overruled in part on other grounds by</u> <u>Hope v. Pelzer</u>, 536 U.S. 730, 739 n.9 (2002). But the standard for assessing these claims is the same under either amendment. <u>Hill</u>, 40 F.3d at 1185 n.19; <u>Andujar</u>, 486 F.3d at 1203 n.3.

The Officer Defendants do dispute, however, that Mr. Conley's "obvious distress on the morning of August 15," dkt. no. 41 at 13-17, prior to the time at which Mr. Conley stopped breathing, qualifies as an objectively serious medical condition.  It does.

While it's clear that Mr. Conley had a serious medical need once he stopped breathing, Bozeman v. Orum, 422 F.3d 1265, 1272 (11th Cir. 2005), abrogated on other grounds by Kingsley v. Hendrickson, 576 U.S. 389, 396–402 (2015), the facts as plead in the amended complaint also allege that Mr. Conley had an objectively serious medical need before that moment.  Despite the Officer Defendants' insistence otherwise, the facts of Mr. Conley's distress before he stopped breathing, as alleged in the complaint, go far beyond the facts in Johnson v. City of Bessemer, 741 F. App'x 694, 700 (11th Cir. 2018).  In Johnson, the court determined that the inmate's "behavior was entirely consistent with someone sleeping heavily."  Id. at 700.  So, it held that "[g]iven the difficul[ty] [in][] detect[ing] [the] line between sleeping and unconsciousness, and the undisputed fact that [the inmate] was breathing every time [the jail officer] checked on her," the need for medical treatment was not sufficiently obvious so as to constitute a serious medical need.  Id.

In contrast, while it is unclear how long Mr. Conley was parked in the Jail hallway in his wheelchair before he stopped breathing, dkt. no. 38 ¶¶ 49–50, even a lay person would recognize

that Mr. Conley's condition even before that point required medical attention.  See Patel v. Lanier Cnty., 969 F.3d 1173, 1189–90 (11th Cir. 2020) (holding a prisoner had an objectively serious medical need even where he was "not diagnosed as needing medical care until after" the incident where he was found unconscious, and later began "hyperventilating, and . . . had mucus running from his nose and mouth").  Plaintiffs allege that Defendant Little found Mr. Conley "unresponsive," "curled up on the concrete floor near the door," in his cell, appearing "cold and gray," with "dried blood under his nose," apparently having not eaten or had anything to drink all day.  Dkt. No. 38 ¶¶ 4, 48–52.  The amended complaint goes on to explain that in response, "Defendants Little, McCallum and Johnson dragged Mr. Conley into a wheelchair and propped him up in the jail's hallway," and that Defendant McCallum placed shackles on Mr. Conley's legs.  Id. ¶ 49.  Unlike in Johnson, there is no question that the amended complaint alleges that Defendants Little, Johnson, and McCallum knew that Mr. Conley was not only unresponsive, but, without a doubt, not asleep.  Johnson, 741 F. App'x at 700; Dkt. No. 38 ¶¶ 48–52.  Moreover, these factual allegations sufficiently describe the severity of Mr. Conley's condition that morning which "even a lay person would easily recognize the necessity for a doctor's attention." Goebert, 510 F.3d at 1326 (quoting Hill, 40 F.3d at 1187).  Thus, Mr. Conley's "obvious distress on the morning of August 15," even before the

moment he stopped breathing, also qualifies as an objectively serious medical need.  Dkt. No. 41 at 13-17

**B. Deliberate Indifference**

Having sufficiently plead that Mr. Conley had an objectively serious medical need, Plaintiffs "must satisfy [a] *subjective* component" by alleging "that the prison official[s] acted with deliberate indifference to h[is] serious medical need." Goebert, 510 F.3d at 1326 (emphasis added).  And, if Plaintiffs succeed in that step, they must allege that each Defendant's wrongful conduct caused the constitutional injury.  Id.

The subjective knowledge prong of a deliberate indifference claim requires the Officer Defendants be "both . . . aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994).  However, deliberate indifference does not include "an official's failure to alleviate a significant risk that he should have perceived but did not." Id. at 838.  "Rather, the [defendant] must have actually perceived the medical need." Keele v. Glynn Cnty., 938 F. Supp. 2d 1270, 1292 (S.D. Ga. 2013) (citing Presley v. City of Blackshear, 650 F. Supp. 2d 1307, 1315 (S.D. Ga. 2008), aff'd 340 F. App'x 567 (11th Cir. 2009)).  "Whether a particular defendant has subjective knowledge . . . is a question of fact[,] 'subject to demonstration in the usual ways, including inference from circumstantial

20

evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" Goebert, 510 F.3d at 1327 (quoting Farmer, 511 U.S. at 842). Particularly relevant here, non-medical prison officials "who rely on medical personnel for . . . clinical determinations lack the requisite knowledge for deliberate indifference, absent evidence that [those] clinical determination[s] were unreliable." Lynch v. Jackson, 478 F. App'x 613, 619 (11th Cir. 2012).

Likewise, "[d]isregard of the risk is also a question of fact that can be shown by the standard methods." Goebert, 510 F.3d at 1327. It requires Plaintiffs to sufficiently allege that the Officer Defendants "disregarded [the substantial] risk by failing to take reasonable measures to abate it." Keele, 983 F. Supp. 2d at 1292 (alteration accepted) (quoting Farmer, 511 U.S. at 847). So, even if a given defendant "actually knew of a substantial risk to a prisoner's health and the resulting harm was not ultimately averted, no liability [attaches] if the defendant responded reasonably to the perceived risk." Davison, 2016 WL 6404034, at *4 (citing Keele, 938 F. Supp. 2d at 1292).

Plaintiffs must also sufficiently plead that the Officer Defendants' conduct constituted "more than gross negligence." Id. at *5; see also Wade v. McDade, 67 F.4th 1363, 1372-73 (11th Cir. 2023). Moreover,

> In cases that turn on the delay in providing medical
> care, rather than the type of medical care provided . .
> . [or] [w]here the prisoner has suffered increased
> physical injury due to the delay, we have consistently
> considered: (1) the seriousness of the medical need; (2)
> whether the delay worsened the medical condition; and
> (3) the reason for the delay.

Goebert, 510 F.3d at 1327 (citing Hill, 40 F.3d at 1189). Finally, Plaintiffs must sufficiently plead a "causal connection" between the Officer Defendants and the constitutional injury. Id. (citing Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003), abrogated in part on other grounds by Randall v. Scott, 610 F.3d 701 (11th Cir. 2010)). Causation "can be shown by personal participation in the constitutional violation." Id.

Further, "[w]hether a particular defendant was subjectively indifferent is a unique inquiry as to each individual." Keele, 938 F. Supp. 2d at 1293 (citing Presley, 650 F. Supp. 2d at 1315); see also Burnette v. Taylor, 533 F.3d 1325, 1331 (11th Cir. 2008) ("[I]mputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference." (first citing Gray v. City of Detroit, 399 F.3d 612, 616 (6th Cir. 2005); and then citing Whiting v. Marathon Cnty. Sheriff's Dep't, 382 F.3d 700, 704 (7th Cir. 2004))). So, because each of the Officer Defendants encountered Mr. Conley at different times, the Court separately analyzes whether the amended complaint alleges each Officer Defendant was deliberately indifferent to Mr. Conley's serious medical needs.

See Burnette, 533 F.3d at 1331 ("Each individual Defendant must be judged separately and on the basis of what that person [knew].").

**1. Defendant Stevens is not entitled to qualified immunity.**

Plaintiffs allege that on the morning of August 12, Defendant Stevens found Mr. Conley in his cell "seizing . . ., incoherent, his shirt covered in blood, his head bleeding, and his pants soiled." Dkt. No. 38 ¶ 40. Despite this, Plaintiffs allege, Defendant Stevens cleaned Mr. Conley's cell and provided him new clothes, but Stevens did nothing to address Mr. Conley's seizures or other medical conditions. Id. Plaintiffs further allege:

- Defendant Stevens, alongside the other Officer Defendants, "observed and knew that jail medical personnel were not treating or otherwise responding adequately to Mr. Conley's persistent seizures and physical decline," id. ¶ 36;

- Defendant Stevens, alongside the other Officer Defendants, "observed and knew that no medical doctor was involved in Mr. Conley's daily treatment, that the jail nurse often there, Defendant Wingate, provided no care to Mr. Conley because she unreasonably believed Mr. Conley to be faking his symptoms, and that Mr. Conley continued for days and days to experience seizures, falls, physical decline, and other serious medical issues with no response whatsoever by jail medical personnel," id. ¶ 37; and

- "It was obvious and apparent to each of these Defendants that

23

Mr. Conley was not receiving any effective care, or any care at all, for his serious medical conditions. Any deference by these Defendants to the medical judgment of jail medical personnel – that Mr. Conley was faking and deserved no treatment – was obviously unreasonable." Id. ¶ 39.

The Officer Defendants' insistence that Plaintiffs' claims against Defendant Stevens, as well as the other Officer Defendants, should be dismissed under Lynch, 478 F. App'x at 619, is unavailing. The Officer Defendants correctly note that in Lynch, the Eleventh Circuit explained, "[p]rison officials who rely on medical personnel for . . . clinical determinations lack the requisite knowledge for deliberate indifference, absent evidence that clinical determinations were unreliable." Id. at 619; Dkt. No. 41 at 12-13. Indeed, "it is widely held that non-medical prison personnel are generally entitled to rely on the expertise of the medical staff and are not required to second-guess the medical staff's judgment regarding an inmate's care." Stallworth v. Graham, No. 4:14-cv-00134-RDP, 2015 WL 4756348, at *5 (N.D. Ala. Aug. 11, 2015) (first citing Johnson v. Doughty, 433 F.3d 1001, 1011 (7th Cir. 2006) ("Except in the unusual case where it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment, prison officials may reasonably rely on the judgment of medical professionals."(emphasis added)); and then citing Kelly v.

24

Ambroski, 97 F. Supp. 3d 1320, 1343 (N.D. Ala. 2015) ("[I]n the absence of a reason to believe, or actual knowledge, that medical staff is administering inadequate medical care, non-medical prison personnel are not chargeable with the Eighth Amendment scienter requirement of deliberate indifference." (citing Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004))).

However, Plaintiffs have adequately plead "a reason to believe, or actual knowledge" that Mr. Conley's medical care was inadequate. Kelly, 97 F. Supp. 3d at 1343 (citing Spruill, 372 F.3d at 236). For example, in addition to the allegations regarding the Officer Defendants' personal knowledge of the lack of adequate medical care and their unreasonable reliance on that care due to the providers' belief that Mr. Conley was faking his condition, dkt. no. 38 ¶¶ 36, 37, 39, Plaintiffs allege that Mr. Conley's brother "told the on-duty jail personnel – including each of the [Officer] Defendants – that Mr. Conley's seizures were not controlled, were getting worse, and required medical intervention," but Defendants ignored him. Id. ¶ 31. So, even if Defendants are correct that Mr. Conley was seen or even "treated" "on each of the days" that Defendant Stevens interacted with Mr. Conley, at this stage, it is not apparent that Mr. Conley's treatment was reliable or reasonable. Dkt. No. 41 at 14. To the contrary, the amended complaint explicitly alleges any treatment provided was inadequate and that any reliance on such treatment

was unreasonable.  Dkt. No. 38 ¶ 39.

Moreover, the Officer Defendants' argument that the amended complaint fails to state a claim as to each of the Officer Defendants because it seeks to "impute" knowledge from one Officer Defendant to another is misplaced.  Dkt. No. 45 at 1.  It's true that "collective" knowledge is insufficient to state a claim for deliberate indifference.  Burnette, 533 F.3d at 1331.  However, while the amended complaint alleges that "each of these Defendants" knew and observed Mr. Conley's condition but ignored his needs, at this stage, and based on the allegations supporting Mr. Conley's individual interactions with each Officer Defendant, the Court accepts Plaintiffs' allegations that *each* of these Officer Defendants was aware of Mr. Conley's medical need and instead of addressing those needs, did nothing, and deferred to medical personnel, knowing that deference was unreasonable.  Id. ¶¶ 30-39 (alleging, among other things, that each of the Officer Defendants knew Mr. Conley's seizures were not controlled, that his condition worsened over the course of his ten days at the Jail, that Mr. Conley suffered from various physical injuries because of his uncontrolled seizures, that medical personnel were not treating or otherwise responding adequately to Mr. Conley's needs, and despite that knowledge, did nothing to help him).

Thus, Plaintiffs have sufficiently alleged that Mr. Conley had a serious medical need, that Defendant Stevens was aware of

that need, and that he acted with deliberate indifference to that need.  Accordingly, Defendants' motion to dismiss the deliberate indifference claims against Defendant Stevens is **DENIED**.

**2. Defendant Harris is not entitled to qualified immunity.**

Plaintiffs allege Defendant Harris was deliberately indifferent to Mr. Conley's serious medical need on two occasions. Regarding the first instance, the amended complaint alleges that on August 13, 2020, Defendant Harris called Defendant Wingate, the Jail nurse, when Mr. Conley appeared to have a seizure, and, according to the affidavit of Lori Roscoe, "[t]he medications are noted by LPN Wingate as administered on Mr. Conley's Medication Administration Record."  Dkt. No. 38 at 63-64.  Plaintiffs also allege that on August 14, 2020, Defendant Harris "dragged [Mr. Conley] out of his cell on his mattress" after he suffered a series of seizures.  Id. ¶ 42.  Plaintiffs further allege that Mr. Conley told jail staff "he did not feel good," but despite that, "[n]o one did anything to help him."  Id.

Defendants' argument that Lynch bars Plaintiffs' claims against Defendant Harris fails.  Plaintiffs have adequately plead Defendant Harris had "a reason to believe[] or actual knowledge" that Mr. Conley's medical care was inadequate.  Kelly, 97 F. Supp. 3d at 1343 (citing Spruill, 372 F.3d at 236).  Not only have Plaintiffs alleged Defendant Harris's personal knowledge of Mr. Conley's serious medical need and lack of adequate medical care,

27

dkt. no. 38 ¶¶ 36-37, and Defendant Harris's unreasonable reliance on any care provided, id. ¶ 39, Plaintiffs have also alleged that Mr. Conley's brother informed the on-duty Jail personnel, "including each of the Defendants," that the medical care provided was inadequate, id. ¶ 31. So, the Officer Defendants' argument in this regard fails for the same reason it fails as to Defendant Stevens—regardless of the Officer Defendants' contention that Mr. Conley was "treated" "on each of the days" that Defendant Harris interacted with him, at this stage, it is not apparent that Mr. Conley's medical treatment was reliable or reasonable. Dkt. No. 41 at 14.

Defendants' "collective knowledge" argument likewise fails for the same reasons stated supra pp. 27-28.

Thus, Plaintiffs have sufficiently alleged that Mr. Conley had a serious medical need, that Defendant Harris was aware of that need, and that he acted with deliberate indifference to that need. Accordingly, Defendants' motion to dismiss the deliberate indifference claims against Defendant Harris is **DENIED**.

**3. Defendant Blash is not entitled to qualified immunity.**

Plaintiffs allege that Defendant Blash, who was in charge of performing cell checks on August 14, and who knew Mr. Conley was having seizures, later told investigators that "she did not need to check on [Mr.]Conley often because she could hear him moaning." Id. ¶ 44. According to the amended complaint, Defendant Blash

28

also told investigators that "she believed Mr. Conley was 'pleasuring himself' as he rolled around, bruised, shirtless, pantsless [sic], incoherent, and moaning, on the bare floor of his cell." Id. Plaintiffs allege that despite these observations, Defendant Blash "did nothing to help" Mr. Conley. Id.

The Officer Defendants' contention that Lynch bars Plaintiffs' claims against Defendant Blash fails. Like the allegations against Defendants Stevens and Harris, Plaintiffs' allegations against Defendant Blash sufficiently indicate she was aware of Mr. Conley's need for medical care and that she acted with deliberate indifference to that need. Id. ¶¶ 30-39, 44. At this stage, it is not apparent that any treatment Mr. Conley received "on each of the days" Defendant Blash interacted with him, dkt. no. 41 at 14, was reliable or reasonable, and in fact, Plaintiffs allege the opposite—that any treatment was inadequate and any reliance on that treatment was unreasonable. Dkt. No. 38 ¶ 39.

Defendants' "collective knowledge" argument likewise fails for the same reasons stated supra pp. 27-28. Accordingly, Defendants' motion to dismiss the deliberate indifference claims against Defendant Blash is **DENIED**.

**4. Defendant Saedroa is not entitled to qualified immunity.**

Plaintiffs allege that on August 14 "and into the early morning of August 15," Defendant Saedroa "observed Mr. Conley

hitting doors with his legs, rolling around, and moaning" and "did nothing to help Mr. Conley." Dkt. No. 38 ¶ 47. Plaintiffs further allege that, alongside the other Officer Defendants, Defendant Saedroa was aware of Mr. Conley's serious medical need but ignored that need, and that Defendant Saedroa unreasonably relied on inadequate medical treatments. Id. ¶¶ 30-39, 47.

So, at this stage, Defendants' Lynch argument is unavailing. Even if Mr. Conley was seen or "treated" "on each of the days" that Defendant Saedroa interacted with Mr. Conley, dkt. no. 41 at 14, the amended complaint explicitly alleges that any treatment provided was inadequate and that any reliance on such treatment was unreasonable, dkt. no. 38 ¶ 39. Further, Defendants' "collective knowledge" argument fails for the same reasons stated supra pp. 27-28.

Accordingly, Defendants' motion to dismiss the deliberate indifference claims against Defendant Saedroa is **DENIED**.

**5. Defendant Little is not entitled to qualified immunity.**

Plaintiffs allege Defendant Little was involved in Mr. Conley's care on two occasions. First, Plaintiffs allege that on August 14, 2020, Defendant Little observed that Mr. Conley was not getting up from the floor of his cell and was "making noises, kicking the wall, and flopping around on the mat on the floor of his cell," yet Little "did nothing to help" Mr. Conley. Dkt. No. 38 ¶ 43. Second, Plaintiffs allege Defendant Little found Mr.

Conley "unresponsive," and that alongside two other Officer Defendants, "dragged Mr. Conley into a wheelchair and propped him up in the jail's hallway." Id. ¶¶ 49-50. Plaintiffs further allege that Defendant Little "placed a blood pressure cuff on Mr. Conley, while Mr. Conley's head lolled back in the wheelchair in the jail hallway, to see whether Mr. Conley had any pulse. He did not." Id. ¶ 54. Further, Plaintiffs allege that after Mr. Conley's "head lolled back," "he stopped breathing, and his eyes became blank and fixed," and "[e]ven at that point, no one at the Jail – including Defendant[] Little, . . . -did anything to help [Mr. Conley]." Id. ¶ 50.

Plaintiffs have sufficiently plead that Defendant Little knew Mr. Conley had a serious medical need and did nothing to help him. Defendants correctly note that Plaintiffs have not specifically alleged that Defendant Little, based on the information available to her at the time, did anything at all after checking Mr. Conley's pulse. Id. ¶ 54. Instead, Plaintiffs jump from alleging that Defendant Little checked Mr. Conley's pulse to a series of paragraphs discussing the actions of all the Officer Defendants, collectively. See id. ¶ 55 ("The fact that Mr. Conley was suffering uncontrolled seizures . . . [was] patently obvious to *each of these Defendants*" (emphasis added)); id. ¶ 56 ("*Each of these Defendants* were aware of the seriousness . . . . *Each of these Defendants* knew that serious harm could result." (emphasis

added)); <u>id.</u> ¶ 57 ("[*E*]*ach of these Defendants* disregarded the risk of harm . . . ." (emphasis added)); <u>id.</u> ¶ 58 ("[*E*]*ach of the Defendants* chose to ignore his pleas for help. *They assumed*, in flat disregard of the obvious distress that played out . . . . *They all decided* to ignore Mr. Conley's obviously serious medical issues . . . . *They all kept ignoring* . . . . *Their* actions well exceed mere negligence . . . ." (emphasis added)).

However, construing these allegations in the light most favorable to Plaintiffs, they do not *fail* to assert that Defendant Little delayed to act after applying the blood pressure cuff.  In fact, the amended complaint is not "silent," dkt. no. 41 at 20, as Defendants insist, about what, if anything, Defendant Little did after checking Mr. Conley's pulse.  To the contrary, the amended complaint alleges Defendant Little knew Mr. Conley was suffering from uncontrolled seizures, dkt. no. 38 ¶¶ 30-39, 43, and on August 15, she knew Mr. Conley wasn't breathing and did nothing, id. ¶¶ 51-52. Instead, the amended complaint alleges that alongside the other Officer Defendants, Defendant Little failed to call an ambulance or perform CPR or other resuscitative measures "[f]or nearly a half-hour after finding Mr. Conley unresponsive in his cell, and long after Mr. Conley stopped breathing in the hallway." <u>Id.</u> ¶ 53; <u>see also</u> <u>Bozeman</u>, 422 F.3d at 1273 ("We also conclude that the Officers, who knew Haggard was unconscious and not breathing and who then failed for fourteen minutes to check

32

Haggard's condition, call for medical assistance, administer CPR or do anything else to help, disregarded the risk facing Haggard in a way that exceeded gross negligence."); id. ("A delay in care for known unconsciousness brought on by asphyxiation is especially time-sensitive and must ordinarily be measured not in hours, but in a few minutes. Still, the right reason for the delay can make a delay of any duration tolerable.").[6]

---

[6] Defendants' argument that Alsobrook v. Alvarado, 477 F. App'x 710, 711 (11th Cir. 2012), calls for a different result here is incorrect. Dkt. No. 53 at 4-6. In Alsobrook, the Eleventh Circuit held that "[t]he district court did not err in finding that the law was clearly established at the time of the incident that allegations of an unjustifiable delay of one hour and forty minutes in treating a continuously bleeding" head gash, a bloody nose, and cuts on the prisoner's forehead and under his eye while the prisoner's "clothes were covered in blood and his face was swelling and bruising[] were sufficient to plead deliberate indifference." Alsobrook, 477 F. App'x at 713. Defendants contend that it is "impossible to perform" an analysis of Plaintiffs' complaint as the court did in Alsobrook because the complaint is "devoid of a critical factual allegation—the length of time that allegedly elapsed between the moment any of these Defendants knew or should have known that [Mr.] Conley had stopped breathing, and the moment that medical professionals were summoned to attend to [Mr.] Conley." Dkt. No. 53 at 5. This argument clearly fails in the face of allegations explicitly noting that all the Defendants failed to call an ambulance or perform CPR or other resuscitative measures "for nearly a half-hour after finding Mr. Conley unresponsive in his cell, and long after Mr. Conley stopped breathing in the hallway." See e.g., dkt. no. 41 ¶ 53. While Defendants insist that caselaw shows as a matter of law that the delay here is insufficient, they do not point to a single case that establishes an explicit time period for an impermissible delay in this context. See Alsobrook, 477 F. App'x at 713 ("As to deliberate indifference, case law has established that both long and short delays can be inexcusable, depending on the medical need and the reason for the delay." (first citing Harris v. Coweta Cnty., 21 F.3d 388, 393-94 (11th Cir. 1994), and then citing Bozeman, 422 F.3d at 1273-74)). Taking all reasonable inferences

Defendants' "collective knowledge" argument fails for the same reasons explained supra pp. 27-28.  Defendants correctly note that Plaintiffs do lump Defendant Little in with the other Officer Defendants in concluding that they all, collectively, "disregarded the risk of serious harm to Mr. Conley and failed or refused to obtain treatment for or otherwise assist him." Dkt. No. 41 at 18-19, Dkt. No. 38 ¶ 57; see also id. ¶¶ 55-60.  However, the amended complaint does sufficiently allege Defendant Little's individual interactions with Mr. Conley, his knowledge of Mr. Conley's uncontrolled seizures throughout his time at the Jail, and Mr. Conley's lack of a pulse on August 15; it also alleges that no one, including Defendant Little, called for help or assisted Mr. Conley for at least one half-hour after originally discovering Mr. Conley was unresponsive.  Dkt. No. 38 ¶¶ 53-54.

So, at this stage, the Court concludes Plaintiffs have sufficiently alleged that Defendant Little disregarded the risk facing Mr. Conley because he knew Mr. Conley was suffering from uncontrolled seizures and did nothing, dkt. no. 38 ¶¶ 30-39, 43, he knew Mr. Conley was unconscious and not breathing and he did not administer CPR or any other resuscitative measures, and he presumably did not call for an ambulance at some point within one

_____

in Plaintiffs' favor, the allegations in the amended complaint sufficiently allege a delay.

half-hour of discovering Mr. Conley was unresponsive, id. ¶¶ 51-57.

Contrary to Defendants' argument otherwise, these allegations surely go beyond providing "[t]hreadbare recitals of the elements of a cause of action" or "mere conclusory statements." Iqbal, 556 U.S. at 679. Accordingly, Defendants' motion to dismiss the deliberate indifference claims against Defendant Little is **DENIED**.

**6. Defendant Johnson is not entitled to qualified immunity.**

Plaintiffs' allegations against Defendant Johnson are likewise sufficient to state a claim for deliberate indifference. Plaintiffs allege Defendant Johnson interacted with Mr. Conley twice. First, Plaintiffs allege that on August 14, "Defendant Johnson looked into Mr. Conley's cell and observed Mr. Conley rolling around from side to side and making a whining noise," and that "Defendant Johnson made no effort to help Mr. Conley." Dkt. No. 38 ¶ 45. Second, on August 15, Defendant Johnson, alongside Defendants Little and McCallum, "dragged Mr. Conley into a wheelchair and propped him up in the jail's hallway" and was aware that Mr. Conley's "head lolled back, he stopped breathing, and his eyes became blank and fixed," but Defendant Johnson did nothing to help Mr. Conley. Id. ¶¶ 49-51.

The Officer Defendants concede that once Mr. Conley stopped breathing, "there is no question that this would have represented an objectively serious medical condition," but they insist that

35

Plaintiffs fail to allege Defendant Johnson "knew that [Mr.] Conley had stopped breathing and failed to act on that knowledge." Dkt. No. 41 at 18. However, Plaintiffs do allege both that Defendant Johnson knew Mr. Conley had stopped breathing and he failed to act. Paragraph 51 of the amended complaint states:

> Defendants Little, McCallum, and Johnson observed and knew from the outset of their close interactions with Mr. Conley that morning that Mr. Conley was in acute, life-threatening distress. They knew that Mr. Conley was in acute, life-threatening distress because, *inter alia*, they lifted Mr. Conley's lifeless, limp, unresponsive, bloody, curled-up body off the floor of the cell into a wheelchair parked in the jail hallway. *They knew because they were all present when Mr. Conley stopped breathing, and observed, realized, and understood that Mr. Conley was not breathing.*

Dkt. No. 38 ¶ 51 (emphasis added).

So, Defendants' "collective knowledge" argument fails in this regard. Dkt. No. 45 at 6; see supra pp. 27-28, 32-33. While some of the amended complaint's paragraphs collectively mention the actions or knowledge of all or none of the Officer Defendants, at this stage, and based on the allegations supporting Mr. Conley's individual interactions with Defendant Johnson, as well as with Defendants Little and McCallum, dkt. no. 38 ¶¶ 45, 49-52, the Court accepts Plaintiffs' allegations that "no one," id. ¶ 53, and "each of these Defendants," id. ¶¶ 55-60, include Defendant Johnson.

So, the amended complaint alleges, in a series of paragraphs, that none of the Officer Defendants, *including Defendant Johnson*, did anything to help Mr. Conley or address that he was not

breathing for at least one half-hour after finding him unresponsive and at least "long after" he stopped breathing.  Id. ¶¶ 50-58. Thus, Plaintiffs' claims are sufficient and Defendants' motion to dismiss the deliberate indifference claims against Defendant Johnson is **DENIED**.

   **7. Defendant McCallum is not entitled to qualified immunity.**

   Plaintiffs' allegations against Defendant McCallum are likewise sufficient to state a claim for deliberate indifference. Plaintiffs have alleged that on August 15, 2020, Defendant McCallum, alongside Defendants Little and Johnson, lifted Mr. Conley into a wheelchair in the Jail hallway, and, once Mr. Conley was in the wheelchair, Defendant McCallum placed shackles on Mr. Conley's legs.  Id. ¶ 49.  Plaintiffs allege that because Defendant McCallum was "present," alongside Defendants Little and Johnson, he "observed, realized, and understood that Mr. Conley was not breathing."  Id. ¶ 51.  The amended complaint goes on to allege that none of the Officer Defendants, including Defendant McCallum, did anything to help Mr. Conley or address that he was not breathing for at least one half-hour after finding him unresponsive, and at least "long after" he stopped breathing.  Id. ¶¶ 50-58.  Moreover, Defendants' "collective knowledge" argument likewise fails for the same reasons stated supra pp. 27-28, 32-33.

Thus, Plaintiffs' allegations are sufficient and Defendants' motion to dismiss the deliberate indifference claim against Defendant McCallum is **DENIED**.

## II. Claims against Defendant Carter

In Count Four, Plaintiffs allege that former Wayne County Sheriff John Carter's enactment and enforcement of four different unconstitutional policies led to Mr. Conley's death.  Dkt. No. 38 ¶¶ 107-43.  Defendant Carter moves to dismiss the claims regarding two of those policies: (1) Policy to Provide No Medical Care on Weekends and (2) Policy to Delay Response by Qualified Emergency Medical Providers.  Dkt. No. 41 at 22-25; see Dkt. No. 38 ¶¶ 128-43.

To state a § 1983 claim, Plaintiffs must allege that "a person" acting under color of state law deprived them of a right secured under the United States Constitution or federal law.  42 U.S.C. § 1983.  It is well-established that "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates 'on the basis of respondeat superior or vicarious liability.'"  Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999) (alterations accepted) (quoting Belcher v. City of Foley, 30 F.3d 1390, 1396 (11th Cir. 1994)).  Instead, supervisory liability under § 1983 arises when "the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the

alleged constitutional deprivation." Figures v. Gordon, No. 22-12121, 2023 WL 352707, at *2 (11th Cir. 2023) (quoting Cottone, 326 F.3d at 1360).

A "policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." Goebert, 510 F.3d at 1332 (quoting Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir. 1997)). "A custom is an unwritten practice that is applied consistently enough to have the same effect as a policy with the force of law." Id. (citing City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988)). "[T]he standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous." Wade, 67 F.4th at 1376 (quoting Braddy v. Fla. Dep't of Lab. & Emp. Sec., 133 F.3d 797, 802 (11th Cir. 1998)).

A causal connection can be shown in three ways: (1) "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so," (2) "when a supervisor's custom or policy results in deliberate indifference to constitutional rights," or (3) "when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." Cottone,

39

326 F.3d at 1360 (internal quotation marks omitted) (alterations accepted) (citations omitted).

Plaintiffs do not allege that Defendant Carter personally participated in the alleged constitutional violations. Nor do Plaintiffs allege that Defendant Carter directed the alleged constitutional violations. Instead, Plaintiffs allege Defendant Carter adopted official policies that resulted in deliberate indifference, and that Defendant Carter was aware that these policies could lead to constitutional violations and failed to correct them. Dkt. No. 38 ¶¶ 107-43.

**A. Alleged Policy to Provide No Medical Care on Weekends**

Plaintiffs sufficiently allege that Defendant Carter adopted a policy to provide no medical care on weekends and that this policy resulted in deliberate indifference.

Plaintiffs allege that then-Sheriff Defendant Carter contracted with SCMG for medical care services at the Jail. Id. ¶ 128. According to the amended complaint, the Jail's contract "provided no on-site medical care to its inmates over any weekend. No nurse, no doctor, and no other medical professional was at the Jail on the weekends . . . [and] [n]o exception existed for situations – like Mr. Conley's – in which an inmate had a serious, worsening medical condition that necessitated close supervision by a qualified medical professional." Id. ¶ 129 (emphasis removed). Plaintiffs further allege "Defendant Carter knew that failing to

40

have any medical care available over the weekend to inmates –
particularly those inmates, like Mr. Conley, with known serious
medical needs requiring close supervision – would result in serious
injury or death," and "[d]espite that knowledge, Defendant Carter
ordered and authorized that no such care be provided." Id. ¶¶ 130-
131.

Moreover, Plaintiffs allege, as a result of this policy, Mr.
Conley suffered from the absence of medical care on two occasions.
Id. ¶¶ 132-33. First, Plaintiffs allege that as a result of this
policy, "Mr. Conley's uncontrolled seizure disorder and withdrawal
resulted in a serious fall on Sunday, August 9, 2020, in which he
lacerated and fractured his skull and required emergency treatment
at a local hospital." Id. ¶ 132. Second, Plaintiffs allege that
as a result of this policy, "Mr. Conley rapidly declined into
incoherence and eventual death in the early morning of Saturday,
August 15." Id. ¶ 133.

Defendants rely on Weaver v. Tillman to support their argument
that Plaintiffs' claims against Defendant Carter fail. Dkt. No.
41 at 23-24 (citing Weaver v. Tillman, No. 05-0449-WS-B, 2006 WL
1889565, at *11 (S.D. Ala. July 10, 2006), aff'd sub nom., Weaver
v. Mobile Cnty., 228 F. App'x 883 (11th Cir. 2007)). However,
Defendants mischaracterize the court's finding in Weaver. The
district court did not find, as Defendants suggest, "no deliberate
indifference where medical staff were on site at a jail five days

41

a week for four hours per day." Id. at 23.  Instead, the district court noted that the jail's operations concerning the provision of medical treatment to prisoners had improved from when the plaintiff's alleged incidents had occurred—including having a "licensed medical doctor . . . provide medical treatment on-site five days per week for at least four hours per day"—such that the change in operations cut against the plaintiff's ability to establish a widespread history of constitutional violations. Weaver, 2006 WL 1889565, at *11; see also id. at *11 n.28 ("In pointing out that [defendant] contracted with a third-party provider for medical services, the Court is not suggesting that such an arrangement insulates [defendant] from responsibility for providing adequate medical care to inmates. It plainly does not . . . . What the Court is saying, however, is that this development is one of many that vitiates plaintiff's reliance on circumstances pertaining to [an inmate who passed away] in 2000 to argue a widespread practice of deliberate indifference at the Jail as of 2003."); id. at *11 ("Under Eleventh Circuit authority, the existence of past constitutional violations at a jail is not a scarlet letter condemning a jail supervisor to automatic § 1983 exposure forevermore on a 'widespread practice' theory, when substantial, effective remedial actions have been taken in the interim."). The Weaver court did not find, as Defendants insist, that the provision of medical treatment on-site five days per week

42

for at least four hours per day was sufficient as a matter of law. Id. at *11.

Finally, Defendant Carter's argument that "Plaintiffs do not allege any facts suggesting that a different policy would have produced a different outcome" is not persuasive.  Dkt. No. 41 at 23.  Plaintiffs sufficiently allege what the federal rules require of them—that Defendant Carter adopted an official policy that resulted in deliberate indifference to Mr. Conley's constitutional rights.  See Cottone, 326 F.3d at 1360.  Accordingly, Defendants' motion to dismiss Plaintiffs' claims against Defendant Carter concerning the alleged policy to provide no medical coverage on the weekends is **DENIED.**

**B. Alleged Policy to Delay Response by Qualified Emergency Medical Providers**

Plaintiffs also sufficiently allege Defendant Carter adopted a policy to delay a response by qualified emergency medical providers and that this policy resulted in deliberate indifference.

Plaintiffs allege that Defendant Carter established "the 'Emergency Medical Services' policy . . . that delayed emergency medical response by qualified personnel to life-threatening incidents at the Wayne County Jail."  Dkt. No. 38 ¶ 134.

Pursuant to the policy,

43

Wayne County Jail staff who discovered an inmate
suffering a life-threatening condition were prohibited
from immediately summoning emergency medical personnel.
Instead, jailors were required to contact or attempt to
contact their supervisor, who often was not present or
available at the Jail. Only once the supervisor could be
located and informed of the situation was the supervisor
then empowered to summon emergency medical personnel.

Id. ¶ 135.

Plaintiffs allege that "[t]he practical effect of this
policy, known and understood by Defendant Carter, was to
substantially increase the time required for emergency medical
personnel to be on hand to treat an inmate's life-threatening
condition." Id. ¶ 136. Plaintiffs further allege "Defendant
Carter knew that the delay caused by this policy would result in
serious injury or death to inmates experiencing life-threatening
conditions at the Wayne County Jail." Id. ¶ 137. Moreover,
Plaintiffs allege that with respect to Mr. Conley,

[T]his policy caused a nearly thirty-minute delay
between the time he was found unresponsive in his cell
on the morning of August 15, 2020, and the arrival of
emergency personnel at the Jail. During that thirty-
minute period, no life-saving measures were performed on
Mr. Conley. No one qualified to offer more than basic
first aid was present to attempt to resuscitate Mr.
Conley, and no such attempts were made. As the Jail
delayed in summoning emergency medical personnel, Mr.
Conley sat propped in a wheelchair in the hallway of the
Jail, stopped breathing, and died.

Id. ¶ 138.

The amended complaint alleges, in clear terms, see id., that
the "policy results in deliberate indifference." Cottone, 326

44

F.3d at 1360.   Considering these allegations, Defendants' lone argument that Plaintiffs' claim is "unsupported by any factual allegations that this policy affected [Mr.] Conley," dkt. no. 41 at 24, is unavailing.

Thus, Plaintiffs sufficiently allege that Defendant Carter adopted an official policy that resulted in deliberate indifference to Mr. Conley's constitutional rights. Accordingly, Defendants' motion to dismiss Plaintiffs' claims against Defendant Carter concerning the alleged policy to delay response by qualified emergency medical providers is **DENIED.**

**CONCLUSION**

For these reasons, Defendants' partial motion to dismiss, dkt. no. 41, is **DENIED.**

**SO ORDERED** this 13th day of July, 2023.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA